## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

IN RE *EX PARTE* APPLICATION OF
NATIONAL BANK TRUST FOR AN
ORDER TO TAKE DISCOVERY FOR USE
IN A FOREIGN PROCEEDING
PURSUANT TO 28 U.S.C. § 1782.

Civil Action No. 3:20-mc-85 (CSH)

**MARCH 7, 2023**

## RULING ON MOTION FOR PROTECTIVE ORDER

**HAIGHT, Senior District Judge:**

In October of 2020, National Bank Trust ("NBT") applied for discovery under 28 U.S.C. § 1782 to aid in enforcing the judgment of a court in the United Kingdom against Connecticut residents Sergey Belyaev and Irina Belyaeva ("the Belyaevs").

The Court granted NBT's application in a prior ruling, Doc. 4, and subsequently issued a ruling on a joint request for a protective order, Doc. 11, and a protective order, Doc. 12. Familiarity with these documents is assumed.

Sergey Belyaev now appears, and contests the propriety of the discovery order. He argues that court-ordered discovery violates the letter and spirit of U.S. sanctions on NBT's majority owner, the Central Bank of the Russian Federation (the "Central Bank"), and that the Court should exercise its discretion to halt discovery entirely. In the alternative, he argues that discovery should be cabined to the period from January 1, 2016 to the present. NBT objects. This ruling resolves both issues.

## I. BACKGROUND

### A. Factual Allegations

National Bank Trust was once one of Russia's largest banks.[1] With more than four hundred retail branches across Russia, it held the deposits of some 1.5 million customers. U.K. Action ¶ 12. NBT drew on those deposits to make extensive and risky loans; half went to companies belonging to the bank's three largest shareholders. *Id.* ¶¶ 13–14, 379. The loans began to fail. *Id.* ¶¶ 2–4. Facing scrutiny from Russian regulators, the three shareholders—Ilya Yurov, Nikolay Fetisov, and Sergey Belyaev—set up an offshore network of hundreds of shell companies, managed by a full-time team, to make it appear that the loans were being repaid. *Id.* ¶¶ 5–6, 387–91. Yurov called it "balance sheet management[;]" Lord Justice Stephen Males, writing for the High Court of Justice in London, called it "a Ponzi scheme with a fancy name." *Id.* ¶ 19.

In 2014, amid falling oil prices and western sanctions over Russia's annexation of Crimea, NBT collapsed and was brought under the majority ownership of the Russian Central Bank. *Id.* ¶ 1349.[2] NBT filed suit in the United Kingdom for fraud against the three former shareholders and their wives. *Id.* ¶¶ 1, 17, 1071. After a nine-week trial before Mr. Justice Simon Bryan, a High Court Judge assigned to the Queen's Bench Division (now King's Bench Division), NBT prevailed and was awarded approximately U.S. $900 million in damages. *Id.* ¶¶ 1, 1945.

---

[1] The factual background is primarily drawn from *Nat'l Bank Trust v. Ilya Yurov* [2020] EWHC 100 (Comm.) (the "U.K. Action"), the opinion in which is attached to NBT's application as Docs. 1-1 and 1-2.

[2] *See also* Max Colchester & Margot Patrick, *Hiding Russian Money Was Easy. Quitting Was Harder.*, WALL ST. J. (Aug. 4, 2018, 2:33 AM), https://www.wsj.com/articles/hiding-russian-money-was-easy-quitting-was-harder-1533355260 [https://perma.cc/WQ6R-B8GN]; Max Seddon, *Russian Bank Owners Ordered to Pay $900m over Collapse*, FIN. TIMES (Jan. 23, 2020), https://www.ft.com/content/542ef3fe-3de3-11ea-a01a-bae547046735 [https://perma.cc/Z9LB-BXHY].

The judgment remains outstanding. Appl. at 3. As a result, NBT is engaged in proceedings around the world—including in the United Kingdom, Finland, and Switzerland—to enforce the judgment. *Id.* With those proceedings pending, the Belyaevs fled Russia and came to Avon, Connecticut, where they now reside. Appl. at 3.

### B. Procedural Posture

On October 8, 2020, NBT filed this action pursuant to 28 U.S.C. § 1782 seeking discovery from Connecticut Shotgun Manufacturing Company ("Connecticut Shotgun") and four financial institutions: Wells Fargo Bank, Summit Management Corp., Bank of America, and People's United Bank (collectively, the "financial institutions"). *See generally* Appl.[3] NBT based its application on an asset disclosure the Belyaevs submitted in the U.K. Action. Doc. 1 at 3. Their disclosure lists accounts at each of the financial institutions containing more than $2.4 million in total—in addition to six properties, a collection of luxury vehicles, a boat, a piano, and a gun collection they valued at $150,000. *See generally* Doc. 1-3.

NBT sought additional discovery because it was "skeptical" of these asset declarations, for three primary reasons. App. at 3. First, Belyaev asserted that he and his wife "spent all the money" in their accounts at the financial institutions, a claim that NBT found implausible given the size of the accounts. *Id.* Second, NBT's investigation indicated that Belyaev made payments totaling $3,825,833 to Connecticut Shotgun from 2013 to 2015, casting doubt on his valuation of his gun collection at $150,000. *Id.* at 4. Third, in the U.K. Action, Mr. Justice Bryan found Belyaev to be

---

[3] NBT originally sought discovery from only two of the four financial institutions, but on December 11, 2020, added the remaining two financial institutions to its request. *See* Doc. 3. NBT also initially named one institution "Summit Investment Management, Ltd.," Appl. at 1, but then filed a supplemental application clarifying that the entity it wished to subpoena is properly named "Summit Management Corp.," Doc. 5 at 1. I granted this supplemental application on February 25, 2021. Doc. 6.

a thoroughly dishonest witness. U.K. Action ¶¶ 129–72. Mr. Justice Bryan characterized Belyaev and his testimony as "self-evidently untrue," *id.* ¶ 136; "quite astonishing (and wholly incredible)," *id.* ¶ 143; "neither frank, nor honest," *id.* ¶ 148; "not a witness of truth," *id.* ¶ 149; "simply untrue," *id.* ¶ 154; "evasive," *id.* ¶¶ 132, 165–66, 171; "evasive, as usual," *id.* ¶ 170; "prepared to lie," *id.* ¶¶ 166; and "lying," *id.* ¶¶ 166, 702. To aid in its investigation and enforcement efforts, NBT therefore sought statements from the financial institutions as well as records of Belyaev's purchases from Connecticut Shotgun. Appl. at 4–5.

On January 13, 2021, I granted NBT's application in a written ruling. *See* Doc. 4, available at *In re Nat'l Bank Tr.*, No. 3:20-MC-85 (CSH), 2021 WL 118531, *1 (D. Conn. Jan. 13, 2021) (the "2021 Ruling"). NBT proceeded to issue subpoenas to Connecticut Shotgun and the financial institutions. Doc. 10 at 1. Belyaev raised certain objections to the subpoenas with NBT. *Id.* To address most of these objections, NBT and Belyaev jointly moved for a protective order, which the Court granted on June 15, 2021. *See* Docs. 7, 12. Two issues, though, have remained outstanding: the effect, if any, of U.S. sanctions on Russia, and the appropriate time period for discovery (which the parties call the "Timetable Issue"). These outstanding questions are now fully briefed. *See* Docs. 10, 13, 14.[4] This ruling resolves both issues.

---

[4] Belyaev's request of this Court is essentially a motion to quash or modify, although he has not styled it as such. *Cf.* Fed. R. Civ. P. 45(d)(3); *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to [Rule 45].").

## II. LEGAL STANDARD

Pursuant to 28 U.S.C. § 1782, a United States district court has broad discretion to order

discovery to assist with a proceeding in a foreign tribunal. Section 1782 provides, in relevant part:

> The district court of the district in which a person resides or is found may order him
> to give his testimony or statement or to produce a document or other thing for use
> in a proceeding in a foreign or international tribunal . . . . The order may be made .
> . . upon the application of any interested person . . . .

28 U.S.C. § 1782(a).

As the Second Circuit has articulated, "[t]he goals of the statute are to provide equitable

and efficacious discovery procedures in United States courts for the benefit of tribunals and liti-

gants involved in litigation with international aspects, and to encourage foreign countries by ex-

ample to provide similar means of assistance to our courts." *Brandi-Dohrn v. IKB Deutsche In-

dustriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (citations and internal quotation marks omitted).

Accordingly, "[i]n pursuit of these twin goals, the statute has, over the years, been given increas-

ingly broad applicability." *Id.* (citations and internal quotation marks omitted).

Before granting discovery under Section 1782, a district court must ensure that the appli-

cation meets the conditions of the statute, and then, in exercising its discretion, is to be guided by

four factors laid out in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004)

(the "*Intel* factors").

With respect to the statutory conditions, "a district court is authorized to grant a [Section]

1782 request where: (1) the person from whom discovery is sought resides (or is found) in the

district of the district court to which the application is made, (2) the discovery is for use in a foreign

proceeding before a foreign tribunal, and (3) the application is made by a foreign or international

tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d at 80 (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004)).

"[O]nce the statutory requirements are met, a district court is free to grant discovery in its discretion." *In re Application of Metallgesellschaft AG*, 121 F.3d 77, 78 (2d Cir. 1997). Its "discretion, however, is not boundless. Rather, [the Second Circuit has] held that district courts must exercise their discretion under [Section] 1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts . . . ." *Schmitz*, 376 F.3d at 84 (internal quotation marks and citations omitted).

The Supreme Court has further instructed the district courts, in addressing these aims, to consider the four *Intel* factors: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" (*i.e.*, whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach); (2) "the nature of the foreign tribunal, the character of proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance[;]" (3) "whether the [Section] 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States[;]" and (4) whether the discovery requests are "unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. 241, 264–65 (2004).

While the *Intel* factors guide the decision, they "are not to be applied mechanically. A district court should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018). "[T]he role of the district courts as gatekeepers is paramount" because their

discretion is so broad. *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134 (2d Cir. 2017) (citing Hans Smit, *Recent Developments in International Litigation*, 35 S. TEX. L. REV. 215, 237 (1994) ("The drafters of [Section] 1782 deliberately gave the American court discretion in granting the assistance for which it provides.")).

## III. DISCUSSION

Belyaev asks the Court to halt discovery on the ground that the Court either cannot (under U.S. sanctions) or should not (in applying the discretionary *Intel* factors) grant discovery to a bank that is a subsidiary of a sanctioned entity. Should the Court reject this argument, he asks that it limit the time period of discovery to records from January 1, 2016 to the present. Doc. 10 at 2–3. (The Court's 2021 Ruling allowed NBT to subpoena bank statements from the financial institutions dating back to January 1, 2015, and records of Connecticut Shotgun dating back to June 1, 2013. 2021 WL 118531, at *4; Docs. 1-4 (Exh. C), 1-5 (Exh. D.), 3, 5.)

I have already ruled that the application meets the statutory prerequisites of Section 1782, and that the discretionary *Intel* factors favor document production. *See* 2021 WL 118531, at *1–4. Accordingly, in this Ruling I address those factors only to the extent that the parties' new arguments implicate them.

### A. Sanctions Argument

Belyaev contends that NBT's status as a subsidiary of a sanctioned entity should preclude the Court from assisting NBT in obtaining discovery. *See* Doc. 10 at 2–3. I first examine whether any provision of the U.S. sanctions regime constrains this Court's Section 1782 authority, and then turn to whether the executive department's foreign policy toward the Russian Federation, as evident in the sanctions regime, would be properly weighed as a discretionary factor in the Section

7

1782 analysis.

On April 15, 2021, President Joseph R. Biden, Jr. issued Executive Order 14024 pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 212(f) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(f), and 3 U.S.C. § 301. Finding "that specified harmful foreign activities of the Government of the Russian Federation . . . constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[,]" the President invoked his emergency powers to "[a]ll property and interests in property that are in the United States" belonging to any "political subdivision, agency, or instrumentality of the Government of the Russian Federation" or "owned or controlled by . . . the Government of the Russian Federation" from being "transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14024, Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation, 86 Fed. Reg. 20249–50 (Apr. 15, 2021) ("E.O. 14024"). E.O. 14024 defines the "Government of the Russian Federation" as including the Central Bank. E.O. 14024 § 6(b). Pursuant to E.O. 14024, OFAC issued full blocking sanctions against Public Joint Stock Company Bank Financial Corporation Otkritie ("Otkritie"). OFAC, SANCTIONS LIST SEARCH, https://sanctionssearch.ofac.treas.gov/Details.aspx?id=34497 [https://perma.cc/53C6-2FFQ].[5]

On February 28, 2022, the Office of Foreign Assets Control of the U.S. Department of the

---

[5] *See also* U.S. DEP'T OF THE TREASURY, U.S. TREASURY ANNOUNCES UNPRECEDENTED & EXPANSIVE SANCTIONS AGAINST RUSSIA (Feb. 24, 2022), https://home.treasury.gov/news/press-releases/jy0608 [https://perma.cc/M292-U3LS]. OFAC defines "blocking" as follows: "Another word for it is 'freezing.' It is simply a way of controlling targeted property. Title to the blocked property remains with the target, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC. Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property." OFAC, FREQUENTLY ASKED QUESTIONS 9 (Sept. 10, 2002), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9 [https://perma.cc/W9QR-AT3K].

Treasury issued a directive pursuant to E.O. 14024 entitled "Prohibitions Related to Transactions Involving the Central Bank of the Russian Federation, the National Wealth Fund of the Russian Federation, and the Ministry of Finance of the Russian Federation." 87 Fed. Reg. 32306–07 (Feb. 28, 2022) ("Directive Four"). Directive Four states that "the Director of the Office of Foreign Assets Control has determined, in consultation with the Department of State, that the Central Bank of the Russian Federation [and the two other entities] are political subdivisions, agencies, or instrumentalities of the Government of the Russian Federation[.]" Directive Four proceeds to declare

> that the following activities by a United States person are prohibited, except to the extent provided by law, or unless licensed or otherwise authorized by the Office of Foreign Assets Control: Any transaction involving the Central Bank of the Russian Federation [or the other two entities], including any transfer of assets to such entities or any foreign exchange transaction for or on behalf of such entities. All other activities with entities determined to be subject to the prohibitions of this Directive, or involving their property or interests in property, are permitted, provided that such activities are not otherwise prohibited by law, the Order, or any other sanctions program implemented by the Office of Foreign Assets Control.

*Id.* at 32307.

Under OFAC's "fifty-percent rule," an entity in which a blocked entity owns fifty percent or more shares is itself blocked. *See* 31 C.F.R. § 510.441 (2018). However, OFAC states on its official website that the fifty-percent rule does not apply to Directive Four, meaning that entities majority-owned by the Central Bank are not necessarily blocked. OFAC, FREQUENTLY ASKED QUESTIONS 1001 (Mar. 2, 2022), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/1001 [https://perma.cc/SQV8-7M2H].[6]

---

[6] OFAC's interpretations of its own regulations normally control. *See Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000) ("[T]he interpretation of the provision given by the agency charged with enforcing the embargo is normally controlling."), citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Paradissiotis v. Rubin*, 171 F.3d 983, 987 (5th Cir. 1999); and *Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) (same).

This Court must deny NBT the relief it seeks if doing so would violate U.S. sanctions. *Cf.*
*Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 474, 476 (2d Cir. 2005) (declining
to enforce a trademark because it "would effect a transfer of property rights to a[n embargoed]
Cuban entity"). NBT is not a sanctioned entity, but two of its shareholders—the Central Bank and
Otkritie—are. The Central Bank owns approximately 97.7% of NBT, according to the translated
list of shareholders in NBT filed by Belyaev. Exh. C (Doc. 10-3) at 2. Otkritie owns approximately
1.3% of NBT. *Id.* Because Otkritie's share in NBT is less than fifty percent, NBT is not subject to
the blocking sanctions on Otkritie. Nor is NBT subject to Directive Four's prohibitions on the
Central Bank, since the Central Bank is not governed by the fifty-percent rule.

Even if NBT were subject to Directive Four, no authority states that a discovery order to
assist NBT under Section 1782 would violate the directive.

Directive Four prohibits "transaction[s]"—"including any transfer of assets to such entities
or any foreign exchange transaction for or on behalf of such entities"—but makes no mention of
discovery orders. 87 Fed. Reg. 32307. OFAC defines "prohibited transactions" as prohibited "trade
or financial transactions and other dealings," OFAC, Frequently Asked Questions 3 (June 16,
2006), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/3 [https://perma.cc/M9U
S-9K6Q], suggesting an element of a reciprocal exchange of property typical of trade or financial
transactions.[7] This element is necessarily absent from an *ex parte* application for discovery.

---

[7] Black's Law Dictionary defines "transaction" as "1. The act or an instance of conducting business or other
dealings; esp. the formation, performance, or discharge of a contract. 2. Something performed or carried
out; a business agreement or exchange. 3. Any activity involving two or more persons." *Transaction*,
Black's Law Dictionary (11th ed. 2019). The elements of contract, agreement, and exchange are absent
from a subpoena. *See also Transaction*, Merriam-Webster's Unabridged Dictionary ("1. an act, pro-
cess, or instance of transacting: such as . . . (a)(2): compact, covenant; (b): a communicative action or
activity involving two parties or two things reciprocally affecting or influencing each other; 2: something
that is transacted: such as (a): a business deal . . . ."); *Transact*, Oxford English Dictionary ("2.

The terms "transaction" and "other dealings[,]" devoid of context, threaten to encompass an entire world of activities. To understand what they mean here, however, it is useful to apply two well-established interpretive principles: *noscitur a sociis* (a word "is known by its associates") and the more specific *ejusdem generis* (a final, general word in a list of several items has a meaning "of the same kind" as the meaning of the items that precede it).[8]

As the term "other dealings" immediately follows the words "trade or financial transactions[,]" it should, under the principle of *ejusdem generis*, be interpreted in keeping with those words. Similarly, "transaction" is followed shortly thereafter by "including any transfer of assets . . . or any foreign exchange transaction[,]" which *noscitur a sociis* suggests should be understood as limiting "transaction" to activities broadly similar to asset transfers and foreign exchange transactions. For these reasons, the terms "other dealings" and "transaction[,]" properly understood, refer to activities in the general realm of trade and financial transactions, asset transfers, trading in the foreign exchange markets, and similar activities. Directive Four's express grant of broad permission to "[a]ll other activities with entities determined to be subject to the prohibitions of this Directive," 87 Fed. Reg. 32307, supports this reading of "transaction" and "other dealings" as terms limited in scope.

The Southern District of New York applied analogous reasoning in a Section 1782 case

---

*transitive*. To carry through, perform (an action, etc.); to manage (an affair); now *esp.* to carry on, conduct, do (business)." (rare and figurative definitions omitted)). Both the Merriam-Webster's and Oxford definitions include the element of reciprocity absent from the act of complying with court-ordered discovery.

[8] *Cf. Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (relying on the doctrine of *noscitur a sociis* "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (internal quotation marks and citation omitted)); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (interpreting the term "any other class of workers" in the phrase "seamen, railroad employees, or any other class of workers" to include only *transportation* workers). The translations of the Latin terms, and the examples above, are drawn from LEGISLATION AND REGULATION 226, 232 (John F. Manning & Matthew C. Stephenson eds., 2d ed. 2013).

involving a different sanctions regime, in which a Russian governmental bankruptcy receiver sought records from Sergey Leontiev, a former president of a failed Russian bank then living in New York. *Deposit Ins. Agency v. Leontiev*, No. 17-MC-00414 (GBD)(SN), 2018 WL 3536083, at *1, *4 (S.D.N.Y. July 23, 2018). Leontiev moved to quash the subpoenas under the Sergei Magnitsky Rule of Law Accountability Act of 2012 (the "Magnitsky Act"), 31 C.F.R. § 584, which bars the transfer of "property and interests in property" to Russian officials involved in human rights violations and, particularly, those involved in the torture and death of Sergei Magnitsky, a Russian attorney. 2018 WL 3536083, at 1; 31 C.F.R. § 584.201. The applicant was represented by Andrei Pavlov, a Russian attorney who was sanctioned under the Magnitsky Act. *Id.* at *2. Leontiev argued that the provision of discovery "would [therefore] violate the Magnitsky Act because it would deliver property to Pavlov" and would also indirectly violate the statute because "Pavlov will receive pecuniary benefit for any successes achieved in these proceedings[.]" *Id.* at *6.

Addressing these arguments, the Court cited the Second Circuit's holding that there is no "federally created property interest in discoverable materials[,]" *Gary Alan Green & Broadway Sound & Video, Inc. v. Jackson*, 36 F. App'x 663, 669 (2d Cir. 2002), and stated that even assuming Pavlov would receive discovery documents, it

> remains unconvinced that this transfers a property interest to Pavlov. . . . This principle is reflected in the day-to-day function of the Court, as parties routinely request the return of their materials after the end of litigation and seek protective orders that prevent an opposing side from using sensitive materials outside the discovery context. These practices are inconsistent with a finding that the recipient of a document in discovery gains a property right.

*Leontiev*, 2018 WL 3536083, at *8. In the case at bar, E.O. 14024 and Directive Four concern "transactions" and do not contain the Magnitsky Act's language concerning "property and interests in property[.]" However, the logic of *Leontiev* applies here as well: the provision of court-ordered

12

discovery, which may be returned upon court order or subjected—as it is in this case—to a protective order does not constitute a transaction for purposes of E.O. 14024 or Directive Four.

In this case, as in *Leontiev*, a closer issue is that the sanctioned entity, the Central Bank, "stands to gain indirectly from a successful [Section] 1782 application[.]" *Id.* at *8. In *Leontiev*, sanctioned attorney Pavlov represented the applicant and stood to make significant sums, including a fifteen-percent contingency fee, for any recovery. *Id.* Here, NBT intends to use the requested information to enforce its $900 million judgment against Belyaev, perhaps through accounts at the financial institutions. But whether such acts would violate sanctions are, at this stage, speculative and not the proper subject of this Section 1782 action. *Accord In re Bank Otkritie Fin. Corp.*, No. 22-MC-50 (VSB), 2022 WL 2384169, at *2 (S.D.N.Y. July 1, 2022) (granting Section 1782 application by Otkritie, a blocked entity, in aid of two proceedings in London without addressing sanctions issue). And as discussed above, because the fifty-percent rule does not apply to the Central Bank under Directive Four and Otkritie's share in NBT does not rise to the fifty-percent threshold, the record fails to demonstrate how even the enforcement of NBT's judgment would violate E.O. 14024 or Directive Four.

NBT can therefore receive the requested discovery without causing a violation of U.S. sanctions on Russia.

Nonetheless, Belyaev urges that the foreign policy of the United States toward Russia should tip the scales of the Court's discretion. Under the third *Intel* factor, the Court does consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits *or other policies of a foreign country or the United States*." *Intel Corp.*, 542 U.S. at 265 (emphasis

added). Less clear is whether the foreign policy considerations Belyaev highlights are the proper subject of the Court's inquiry.

While the Supreme Court elaborated no further in *Intel* on which "policies of . . . the United States" a district court might consider, *id.*, it cited in support the amicus brief of the United States, which suggested the following:

> The [district] court may likewise examine whether the party seeking assistance under Section 1782 is trying to circumvent foreign discovery limits or other policies of a foreign country or this Nation that would make the requested discovery inappropriate. *See, e.g., Four Pillars Enters.* [*Co. v. Avery Dennison Corp.*], 308 F.3d [1075,] 1080–1081 [(9th Cir. 2002)] (affirming decision to provide applicant with only limited Section 1782 assistance in light of, inter alia, applicant's conviction for conspiracy to steal trade secrets).

Brief for United States as Amicus Curiae Supporting Affirmance at 27, *Intel Corp. v. Advanced Micro Devices, Inc*, 542 U.S. 241 (2004) (No. 02-572), 2004 WL 214306 (italics added). As this citation would suggest, the policy grounds on which district courts deny Section 1782 applications tend to involve privileged or sensitive material, not questions of the executive department's policy favoring or disfavoring a particular foreign entity.

For example, after *Intel* was decided, the District of Maryland denied a Honduran corporation's application for discovery from Michael McNicholas, an American consultant and author on issues of maritime security and counter-narcotics, in the following "peculiar circumstances[.]" *In re Green Dev. Corp. S.A. de C.V.*, No. WDQ-15-2985, 2015 WL 10319091, at *4 (D. Md. Oct. 1, 2015), report and recommendation approved No. CV CCB-15-2985, 2016 WL 640791, *1 (D. Md. Feb. 18, 2016). The applicant alleged that while it was defending an appeal in the Honduran Supreme Court, the appellant in that case had "surreptitiously sent to the Justices . . . a copy of an article that Michael McNicholas authored . . . contain[ing] outlandish defamatory claims accusing

[the applicant's CEO] of laundering money in furtherance of international terrorism, smuggling drugs, and even aiding al-Qaeda." *Id.* at *2 (quoting applicant's allegations). In the U.S. action, the Honduran corporation sought the identities of McNicholas's sources, the contents of a U.S. Department of Defense report, and information concerning McNicholas's motive for writing the article; it hoped to submit what it uncovered to the Honduran Supreme Court to discredit the article and mitigate any effect it may have had on the Justices who received it. *Id.*

The report and recommendation adopted by the district court found that all four discretionary *Intel* factors weighed against granting the petition, noting with respect to the third factor a "concern[] about the significant national security and First Amendment issues raised by [the] request." *Id.* at *4. In particular, "the fact that [the applicant] seeks discovery regarding a Department of Defense report which [the applicant] itself recognizes is 'not publicly available' suggests that the information sought may be secret, classified, or otherwise protected as a matter of national security[,]" and "insofar as [the applicant] seeks to force the journalist Mr. McNicholas to reveal confidential sources used in the preparation of his article . . . , [it] raises substantial First Amendment and privilege concerns." *Id.* (citing Fourth Circuit precedent recognizing journalistic privilege).

Similarly, the Ninth Circuit in *Four Pillars Enterprises*—the case cited by the Government's amicus brief in *Intel*—addressed the "unusual and unequivocal scenario" in which an applicant had been convicted of attempt and conspiracy to steal the opponent party's trade secrets, which had been placed under a protective order in another district. 308 F.3d at 1079. The Ninth Circuit, affirming the district court, concluded that these circumstances constituted valid discretionary grounds to deny a Section 1782 application when the applicant sought those documents for

use in proceedings in China and Taiwan. 308 F.3d at 1079. While *Four Pillars Enterprises* pre-dates the promulgation of the *Intel* factors, its reasoning falls squarely within them and was cited as an example of a decision considering U.S. policy by the Government's amicus brief. Brief for United States at 27, 542 U.S. 241 (No. 02-572). *See also United States v. Zubaydah*, 142 S. Ct. 959, 964 (2022) (concluding that the state secrets privilege applies to information sought under Section 1782 and therefore remanding with instructions to dismiss application); *Kiobel by Samkalden*, 895 F.3d at 241 (denying Section 1782 discovery of documents in law firm's posses-sion because disclosure "would jeopardize the policy of promoting open communications between lawyers and their clients" (internal quotation marks and citation omitted)).

In these cases, courts considered applications for discovery that were directly contrary to U.S. policy concerning state secrets, protection of journalists' sources, protective orders, and com-munications between attorneys and their clients. These decisions suggest that the types of "poli-cies" properly subject to the Court's inquiry under the third *Intel* factor are generally limited to doctrines of discovery and evidence governing the protection of information—in other words, pol-icies similar in kind to the "foreign proof-gathering limits" expressly named in the third *Intel* fac-tor. *See Intel*, 542 U.S. at 265. This conclusion is also in keeping with the interpretive doctrines of *ejusdem generis* and *noscitur a sociis*, as the general term "other policies of a foreign country or the United States" immediately follows the term "foreign proof-gathering limits." *See id.*

In contrast to cases involving discovery or evidentiary doctrines, district courts have on multiple occasions rejected arguments that they should deny discovery merely because U.S. for-eign policy disfavors the recipient. Deciding a separate Section 1782 application by NBT, in which NBT sought discovery for use in a proceeding in Cyprus, the Southern District of New York

16

(*Castel, J.*) recently declined to give weight, under the third *Intel* factor, to either European Union sanctions on NBT or to U.S. foreign policy. *In re Application of PJSC Nat'l Bank Tr.*, No. 21-MC-00867 (PKC), 2022 WL 3925737, at *1 (S.D.N.Y. Aug. 31, 2022). Dmitriy Ananyev and Liudmila Ananyeva (the "Ananyevs"), opposing NBT's application in that case, "argue[d] that NBT is a Russian entity that should not be permitted to retain the discovery already produced to it or obtain further discovery by reason of the Russian invasion of Ukraine." *Id.* While, unlike here, the Ananyevs did not claim that U.S. sanctions directly barred discovery, they claimed that the court in its discretion should deny discovery in light of the foreign-policy positions of Cyprus and the United States regarding Russia. *Id.* While acknowledging that these policies "do indeed have bearing on the third *Intel* factor," the court was nonetheless

> unable to conclude that an Order permitting a Russian entity to conduct discovery in aid of litigation in Cyprus should be vacated because the EU subsequently sanctioned NBT, coupled with the foreign policy of the United States that condemns the actions of the country in which NBT is organized. To date, OFAC has not blocked NBT and [it is] doubtful that any future blocking could be retroactively applied to documents already transmitted to a foreign country.

2022 WL 3925737, at *1. *See also Deposit Ins. Agency*, 2018 WL 3536083, at *5–6 (rejecting argument that discovery would circumvent U.S. policy where the requested discovery would not violate Magnitsky Act sanctions). While it is unclear in this case whether NBT has yet received or transmitted the documents sought, Judge Castel's reasoning concerning the weight of the foreign policy factors remains persuasive.

    In support of his argument regarding the Court's policy discretion, Belyaev cites the RESTATEMENT (FOURTH) OF FOREIGN REL. § 484 (AM. L. INST. 2018), which states: "To the extent provided by applicable law, a court in the United States need not recognize a judgment of a court of a foreign state if: . . . (c) the judgment or claim on which the judgment is based is repugnant to

the public policy . . . of the United States." Setting aside the fact that this case is a Section 1782 application for discovery—not an action to enforce the judgment of the High Court of Justice in London—the comments to the Restatement reveal that Section 484 in fact supports the contrary conclusion. As the reporters cautioned,

> Interpreted broadly, a public-policy defense would frustrate regular and reliable recognition of foreign judgments. The test for public policy is therefore a stringent one. A difference in law, even a substantial one, is not sufficient. A foreign judgment violates local public policy only if its recognition would tend clearly to injure public health, public morals, or public confidence in the administration of law, or would undermine settled expectations concerning individual rights, whether of personal liberty or private property. In practice, states have withheld recognition on public-policy grounds most often when the foreign judgment conflicts with the levels of protection that the Constitution mandates for freedom of speech and the press.

RESTATEMENT (FOURTH) OF FOREIGN REL. § 484 cmt. e (AM. L. INST. 2018). The Court finds the Restatement's cautionary reasoning persuasive in the related context of this Section 1782 application, and certainly not—as Belyaev would have—as a reason to deny the requested discovery on vague policy grounds.

Several further observations support this conclusion. First, as a factual matter, NBT seeks to enforce a judgment not of the Russian Federation, but of the United Kingdom. The special relationship between Washington and London—which I had occasion to note more than thirty years ago, *Zink Commc'ns v. Elliott*, No. 90 CIV. 4297 (CSH), 1990 WL 176382, at *24 (S.D.N.Y. Nov. 2, 1990)—continues today. *See* DEP'T OF STATE, U.S. RELS. WITH U.K. (June 2, 2022), https://www.state.gov/u-s-relations-with-united-kingdom/ [https://perma.cc/V98M-VXF3] ("The United States has no closer Ally than the United Kingdom."). The provision of discovery to NBT will not prevent the United Kingdom from applying any sanctions it has imposed on the Russian government, to the extent required by U.K. law.

18

Second, it is simply not the place of this Court to engage in foreign policy. This Court's ambit is to apply the law as laid out in the Constitution, federal statutes, and federal regulations to the cases that come before it; it is not to divine from such documents a general U.S. policy disfavoring a foreign entity, and on that basis to deny relief to which that entity would otherwise be entitled. This logic applies with special force in the context of economic sanctions, where OFAC expressly permits "[a]ll other activities with entities determined to be subject to the prohibitions of this Directive," 87 Fed. Reg. 32307, and where *over*-compliance with sanctions risks upsetting the precisely tailored balance struck by the sanctions regime.[9]

For these reasons, I conclude that U.S. sanctions on the Central Bank and other Russian entities neither directly bar the relief NBT seeks nor constitute sufficient discretionary grounds to deny NBT's application.

---

[9] Recent statements by the Departments of State and the Treasury point to the precise nature of this balance. *See, e.g.*, DEP'T OF STATE, DIGIT. PRESS BRIEFING WITH U.S. DEP'T OF STATE SANCTIONS COORDINATOR AMBASSADOR JAMES O'BRIEN AND THE DIR. OF SANCTIONS POL'Y AND IMPLEMENTATION JIM MULLINAX (Oct. 19, 2022), https://www.state.gov/digital-press-briefing-with-u-s-department-of-state-sanctions-coordinator-ambassador-james-obrien-and-the-director-of-sanctions-policy-and-implementation-jim-mullinax/ [https://perma.cc/WD2R-NNRU] (discussing efforts to address over-compliance with sanctions and noting, "Our sanctions are very closely targeted to specific acts of corruption, human rights abuses, and undermining democracy."); DEP'T OF THE TREASURY, 2021 SANCTIONS REV. (Oct. 2021), https://home.treasury.gov/system/files/136/Treasury-2021-sanctions-review.pdf [https://perma.cc/S4F3-S6YB] ("Treasury should seek to tailor sanctions in order to mitigate unintended economic and political impacts[.]").

For a summary of policy concerns underlying the interest in narrow tailoring, see U.N. SPECIAL RAPPORTEUR ON UNILATERAL COERCIVE MEASURES, GUIDANCE NOTE ON OVERCOMPLIANCE WITH UNILATERAL SANCTIONS AND ITS HARMFUL EFFECTS ON HUM. RTS., https://www.ohchr.org/en/special-procedures/sr-unilateral-coercive-measures/resources-unilateral-coercive-measures/guidance-note-overcompliance-unilateral-sanctions-and-its-harmful-effects-human-rights [https://perma.cc/PYL3-MQWJ] ("Some over-compliance policies of banks do prevent states, international organizations, diplomats and individuals in targeted countries from participation in international cooperation [and] force companies and individuals to look for alternative ways to transfer money, making the mechanisms of financial transactions opaque, increasing costs and time for transferring money and goods, creating a flourishing underground economy, giving rise to smuggling, [and] fostering corruption and criminal activities[.]").

### B. Timetable Issue

In 2021, this Court allowed NBT to serve subpoenas on the financial institutions for bank statements dating back to January 1, 2015, and on Connecticut Shotgun for records dating back to January 1, 2013. *See* 2021 WL 118531, at *4; Docs. 1-4 (Exh. C), 1-5 (Exh. D.), 3, 5. As an alternative to his sanctions argument, Belyaev seeks to limit all discovery to documents dated on or after January 1, 2016. Doc. 10 at 3. He argues that because he and Belyaeva made a disclosure of their assets in 2016 in connection with the U.K. proceedings, NBT has no need for records before that time. *Id.* He also argues that under Connecticut law, the limitations periods have passed for voiding any transfers before 2016, and that NBT therefore has no use for earlier records. *Id.*

In opposition, NBT reminds the Court that in 2016, Belyaev disclosed a gun collection in Russia worth only $150,000, but NBT later discovered that Belyaev spent more than three million dollars from 2013 to 2015 on purchases from Connecticut Shotgun. Doc. 13 at 7. Additionally, NBT notes its skepticism of Belyaev's claim that he and Belyaeva "spent all the money" in their accounts at the financial institutions, which appear to have totaled more than $2.4 million in 2016. *Id.*; Appl. at 3; Doc. 1-3. NBT wishes "to compare the amounts within the accounts [at the financial institutions] to the amounts disclosed by Belyaev in order to understand what happened to those funds over time, and to locate assets that Belyaev failed to disclose." Doc. 13 at 7. Finally, NBT argues that the statutes of limitations on certain Connecticut causes of action have "no bearing on whether the discovery sought is relevant to or would otherwise assist in the foreign proceedings." *Id.* at 8.

NBT also filed a supplemental opposition to Belyaev's motion. Doc. 14. In it, NBT informed the Court that it had obtained access to Belyaev's account at Bordier Bank in Switzerland

20

and discovered invoices, filed as Document 18-1, showing approximately $2.5 million in pur-chases from Connecticut Shotgun. Doc. 14 at 2–3. These invoices indicate that Connecticut Shot-gun shipped dozens of sporting guns—several valued at more than $100,000—to Belyaev at his residence on Bray's Island, a shooting estate in South Carolina. Doc. 18-1 at 2–12; Doc. 14 at 3.

Belyaev did not respond to NBT's opposition or to its supplemental filing.

In the 2021 Ruling on NBT's application, I wrote that the requests for documents dating back to 2013 and 2015 were neither unduly intrusive nor unduly burdensome under the fourth *Intel* factor:

> Said requests are narrowly tailored, concerning only accounts, assets, and transac-tions of Sergei Belyaev and his wife, Irina Belyaeva. No information or documen-tation is sought regarding other individuals; and the time frames in the discovery requests are sufficiently limited to prevent potential burden. The Court thus finds that all four *Intel* factors favor NBT's application for discovery . . . .

2021 WL 118531, at *4. I see no reason to modify those conclusions now. NBT's requests for bank statements dating back to January 1, 2015, and for Connecticut Shotgun's records dating back to January 1, 2013, remain proper subjects of discovery under Section 1782, particularly in light of NBT's factual allegations and the High Court's findings in the U.K. Action concerning Belyaev's credibility, U.K. Action ¶¶ 129–72. The expiration of certain Connecticut statutes of limitation provides no reason under the *Intel* factors to deny a Section 1782 application to aid in proceedings in the United Kingdom, where there is no suggestion that Connecticut law would be relevant. Accordingly, Belyaev's request to modify the timetable of the subpoenas will be denied.

## IV. CONCLUSION

For the foregoing reasons, Belyaev's motion for a protective order, Doc. 9, is **DENIED**.

NBT may continue in its efforts to obtain the discovery allowed by the Court's prior Rulings, Docs.

4 and 6, including discovery from the financial institutions dating back to January 1, 2015, and

from Connecticut Shotgun dating back to January 1, 2013.

It is SO ORDERED.

Dated: New Haven, Connecticut
        March 7, 2023

/s/ Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge